In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-4010

DERRICK SEARCY,

*Petitioner-Appellee*,

*v.*

DANNY D. JAIMET, Warden,
Hill Correctional Center,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 2164—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 3, 2003—DECIDED JUNE 23, 2003

Before CUDAHY, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Derrick Searcy filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Illinois. He claimed that his conviction for first-degree murder was tainted by the violation of his Sixth Amendment right to a broad opportunity to cross-examine witnesses regarding their motivation to testify against him. The district court agreed that the Illinois state court had indeed violated Searcy's Confrontation Clause rights and granted his petition. Because we do not believe that the Illinois state court's decision regarding the scope of Searcy's cross-examina-

tion rights was either contrary to or an unreasonable application of clearly established federal law, we reverse.

## HISTORY

Petitioner Searcy was tried and convicted by a jury in Cook County Circuit Court on the charge of first-degree murder in the death of Edward Bowman. The State's case against Searcy rested heavily on the testimony of two "occurrence" witnesses who were present during the events leading up to the murder of Bowman.

The first witness, Clarence Johnson, testified that on June 6, 1994, he saw Searcy and Bowman arguing, that Searcy hit Bowman during their argument, and that Searcy repeatedly told Bowman that he was going to kill him. Johnson went on to testify that he witnessed a second altercation between Searcy and Bowman later that same day, this time on the front porch of Searcy's home. During this second argument, Searcy pulled a gun from his shoe and chased Bowman around the side of Searcy's house into the alley. Johnson said he saw Searcy fire two shots at Bowman as he chased him, neither of which hit Bowman. Once Bowman and Searcy reached the alley, Johnson could no longer see them, but he said he heard five more shots a few seconds later. After hearing the shots, Johnson went to the alley where he found Bowman lying on the ground.

The State's second primary witness was Michael Brooks, who was with Johnson during the events of June 6th. Brooks also testified to seeing Searcy and Bowman arguing early in the day and to witnessing the second argument at Searcy's home. Like Johnson, Brooks said he saw Searcy chase Bowman to an alley adjoining Searcy's home and saw Searcy fire two shots at Bowman (he was unaware if those shots actually hit Bowman). Brooks testified that some five to ten seconds later he heard five

more shots, all coming at the same time. He testified to being the first person to arrive at the scene of the shooting, where he found Bowman lying in the alley. Brooks said that Bowman spoke to him at that time, telling him, "Uhh, I'm not going to make it."

The police arrived to find Bowman dead at the scene. At the time, neither Johnson nor Brooks told the police that they believed that Searcy had shot Bowman. Brooks did tell a detective about the earlier confrontation between Searcy and Bowman, but not that he saw Searcy shooting at Bowman in the later incident. Johnson testified that he then drove home and called Bowman's son, Marlonn Boyd, to tell him about the murder of his father. They later returned to the scene, where Brooks said he and Johnson told Marlonn that Searcy had killed his father.

On May 1, 1995, almost one year after Bowman's death, the police arrested Searcy on an unrelated matter. Based on the police interviews of Johnson and Brooks on the day of Bowman's death, Searcy was ultimately charged with Bowman's murder. The State's case against Searcy rested primarily on the testimony of Johnson and Brooks, who testified at trial as to what they allegedly witnessed on the day Bowman was killed.

Given the centrality of the testimony of Johnson and Brooks to the State's case, a key part of Searcy's defense was to call into question their credibility by highlighting discrepancies in their accounts. For example, Searcy pointed out that the medical examiner testified that Bowman had been shot six times in the face. According to both the medical examiner and the defense's expert neurologist, the fourth shot to Bowman's head likely caused immediate death, conflicting with Brooks's account of Bowman talking to him after he had been shot. The defense also offered the testimony of Tonita Mills, who said that on the day Bowman was killed, she saw Brooks arguing

with a man in the alley behind Searcy's house. After she turned away from the argument, she heard several gunshots. As she ran away from the scene, she saw Johnson driving up. She testified that she did not see Searcy at any point that afternoon.

In addition to noting inconsistencies in Johnson's and Brooks's accounts, Searcy also wanted to inquire into their possible biases and motivations in testifying. The defense's theory was that Brooks was the actual shooter of Bowman, with Johnson as his accomplice, because Brooks had learned that Bowman was acting as a police informant, providing information about Brooks's drug-dealing activities. Searcy sought to question them about the fact that after Bowman had been arrested for possession of drugs, he began negotiations with the police to become an informant. He also wanted to cross-examine both Brooks and Johnson about their alleged membership in a gang that sold drugs in competition with Bowman.

Searcy argued that his evidence would show that when Bowman was arrested for drug dealing in 1994, in the presence of someone named Clinton Boyd (who was a neighbor of Johnson), he told police that Michael Brooks was a drug dealer and the one for whom the police were looking. Searcy was prepared to call as a witness Chicago Police Officer Donald Washington, who would testify to the events surrounding Bowman's arrest, as well as his subsequent negotiations with Bowman over the terms of a deal to act as a police informant. He also offered the testimony of Tonita Mills, who the defense said would testify to buying drugs from Brooks and Johnson on numerous occasions. Ultimately, the defense sought to argue that Brooks became aware of Bowman's informant activities (through Clinton Boyd talking with his neighbor Johnson, who would then talk to Brooks), providing a motivation for him to murder Bowman.

Before the opening statements in Searcy's trial, the State moved *in limine* to prevent the defense from offering any evidence about the issue of Bowman working as a police informant. The State was apparently concerned that the defense's theory was to create reasonable doubt as to Searcy's guilt by giving the jury another potential villain, regardless of any evidence backing up accusations against Brooks. The trial court eventually ruled that Searcy could not cross-examine Johnson or Brooks regarding the informant issue unless he could provide a foundation for that line of questioning—by, for example, showing that they knew that Bowman was informing on them.[1]

---

[1] The relevant portion of the sidebar discussion in which the court made its ruling on the State's *in limine* motion proceeded as follows:

COURT:  Could you prove, by competent evidence at trial, that Clinton told [Brooks] that Bowman threw his name in as the owner, possessor, or a drug dealer?

DEFENSE:  I don't think I can make that proof at this point, your Honor, but I do not think that your Honor can hold that against us. It goes to the weight of the statement, not its admissibility. . . . It clearly relates to [Brooks's] motive to kill this fellow, and we've got a clear connection—

COURT:  [Brooks] has to know about it. To develop his motive to want to kill him, he has to know the victim, Bowman, is informing on him.

DEFENSE:  I think we are entitled to let the jury make that decision.

* * *

COURT:  I think the linchpin of this issue, of this situation is, did [Brooks] know even if he or—or was he informed, incorrectly, that the deceased was informing on him.

(continued...)

The trial court did permit the defense to examine both witnesses outside the presence of the jury on the informant issue as a means of laying the foundation for such testimony. During this *voir dire* of Johnson and Brooks, Johnson admitted to knowing Bowman, but said that he had never had a conversation with Clinton Boyd regarding Bowman's arrest. Instead, the communication between Johnson and Clinton Boyd was limited to an occasional

---

[1] (...continued)

DEFENSE: I don't think we can trust [Brooks] to give us an accurate answer in this case, your Honor.

COURT: Then I think you have to do it in some other competent way.

DEFENSE: Your Honor, it's very difficult to prove, for us to go out and prove [Brooks's] guilt. We're entitled to [an] inference that the jury can make that decision.

COURT: That's where I disagree. I think you can't do that. What happens is that we get into insinuations and innuendos, and not fair, logical inferences.

* * *

In terms of the informant issue though, I think it's perfectly clear, and it's alluded to in the case I just cited, that since you have not established that you can show Brooks or Johnson knew that if it is or was true, that Bowman was informing on them in their alleged drug activities, I am going to preclude you from entering into that area. I will, if you want, before Brooks and Johnson testify, let you ask them under oath in cross-examination-type questions, if he was aware of that, and if he says yes, I was, then I immediately will allow you to go into that.

Trial Tr. at X-86-88, X-96-97.

"hello and goodbye." Johnson also testified that no one ever told him that Bowman was considering informing on Brooks. Brooks testified that he also knew Bowman, but denied knowing that Bowman sold drugs or that Bowman had been arrested for drug possession in 1994. Brooks further testified that he had no knowledge that Bowman was considering becoming a police informant against him. Brooks became quite agitated when asked by defense counsel if he was aware that Bowman had told the Chicago police that he was a drug dealer—so agitated, in fact, that the trial judge had to warn Brooks to "calm down" and "restrain [himself]."

Given that the two witnesses did not admit to knowing that Bowman was negotiating with police to become an informant against Brooks, and that Searcy was unable to meet the trial court's requirement that he prove such knowledge by other competent evidence, the trial court granted the government's *in limine* motion and precluded Searcy from inquiring into the informant issue during examination of Johnson and Brooks in the presence of the jury.

The jury ultimately found Searcy guilty of first-degree murder, and the court sentenced him to 42 years imprisonment. Searcy then took his case to the Illinois Court of Appeals, which affirmed the conviction. That court found that the trial court had not erred in precluding examination into the informant issue, noting that while the Sixth Amendment's Confrontation Clause "guarantees the opportunity for effective cross examination[,] testimony under cross-examination may be excluded as irrelevant if it is remote, uncertain or conjectural." *People v. Searcy*, No. 1-98-2406, slip op. at 16 (Ill. Ct. App. Aug. 2, 2000). The court went on to note that given the defense's offer of proof, "[i]t was speculative whether Clinton Boyd overheard Bowman's statements about Brooks . . . it was conjectural whether Brooks or Johnson knew what Mr. Bowman stated to the

police or that he was becoming an informant.*" Id.* at 16-17. Given the chain of speculation required to reach the conclusion that Brooks was motivated to kill Bowman because of his informant activities, the court concluded that "[w]ithout such evidence [of Brooks's or Johnson's knowledge of Bowman's informant activities], it was not error to refuse to allow defendant to present the police officer's testimony or to cross-examine Brooks and Johnson on these matters.*" Id.* at 17.

Searcy filed a petition for leave to appeal to the Illinois Supreme Court, which was denied on November 29, 2000. His next step was to seek a writ of certiorari from the United States Supreme Court; on March 26, 2001, that petition was also denied.

On March 25, 2002, Searcy filed this habeas petition in the United States District Court for Northern Illinois. In his petition, he presented three claims for relief, centered around the Confrontation Clause of the Sixth Amendment: (1) that requiring him to show that the witnesses against him would admit to acts discrediting their testimony as a precondition to cross-examining them about those acts was contrary to the rule established by the Supreme Court in *Alford v. United States*, 282 U.S. 687 (1931); (2) that foreclosing cross-examination of the primary witnesses against him as to their potential bias was an unreasonable application of the principles laid down by the Supreme Court in *Davis v. Alaska*, 415 U.S. 308 (1974), *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), and *Olden v. Kentucky*, 488 U.S. 227 (1988); and (3) that the Confrontation Clause error committed by the Illinois courts was not harmless.

The district court granted Searcy's petition, finding that the Illinois appellate court had "unreasonably applied federal law" by affirming the trial court's limitation on his ability to cross-examine Johnson and Brooks: "Although the appellate court acknowledged the Confrontation Clause issue at stake, and appropriately cited to state authority

which in turn cited to the appropriate federal precedent, the court finds that its analysis was so erroneous as to be unreasonable." *Searcy v. Pierson*, No. 02-C-2164, 2002 U.S. Dist. LEXIS 19899, at *24 (N.D. Ill. Oct. 18, 2002). According to the district court, the state court erred because it "entirely overlook[ed] the centrality of Brooks's and Johnson's testimony to the prosecution's case, as well as the fact that the trial judge precluded all cross-examination on the issue of bias or motive before the jury." *Id.* While the district court did "recognize[ ] and appreciate[ ] a trial judge's discretion to exclude speculative or conjectural evidence on relevance grounds," *id.* at *25, it nevertheless found that the defense had a "good faith factual predicate" for its questions.[2] *Id.* at *26. Having found a Confrontation Clause violation, the district court went on to find that the violation was not harmless and therefore granted Searcy's petition. The State appealed to this Court.

## ANALYSIS

We review the decision of the district court to grant Searcy's habeas petition *de novo. Anderson v. Cowan*, 227 F.3d 893, 896 (7th Cir. 2000). The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), however, significantly constrain any federal court review of a state court conviction. As provided in that statute:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a

---

[2] The district court identified this factual predicate later in its opinion: "Officer Washington's proffered testimony, the veracity of which has not been called into question by the State, provided a sufficient factual predicate to support the theory that Brooks knew the victim [Bowman] had told the police about Brooks' drug activities." *Searcy*, 2002 U.S. Dist. LEXIS 19899, at *28.

State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (2003). Because Searcy's Sixth Amendment Confrontation Clause claims were heard and adjudicated by the Illinois courts, we will grant his habeas petition only if the state court decision falls within one of the narrow categories identified in the statute.

In determining whether the district court was correct in granting Searcy's habeas petition, we first must pin down the "clearly established Federal law" which Searcy argues was offended by the Illinois state court decision. The Supreme Court has stated that only "the holdings, as opposed to the dicta," of that Court's decisions qualify as "clearly established Federal law" for purposes of AEDPA. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Once the clearly established governing legal principles are identified, we must then determine whether the state court's decision was either "contrary to, or involved an unreasonable application of" those legal principles.

### A. *Searcy's "Contrary To" Claim*

We begin with Searcy's contention that the limitation on his ability to cross-examine Johnson and Brooks was contrary to the rule of *Alford*. A state court decision is "contrary to" federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court cases or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result

different from [that] precedent." *Williams*, 529 U.S. at 405-06.

From the Supreme Court's decision in *Alford*, Searcy takes this legal proposition: "[T]he right to conduct otherwise appropriate cross-examination cannot be conditioned upon proof in advance of what the cross-examination would establish." In *Alford*, the Supreme Court held that the trial court was wrong in precluding the defense from asking an adverse witness where he lived. The question was posed because the witness was then in federal custody, and the defendant wished to establish for the jury this basis for potential bias in favor of the government. In reversing the trial court's limitation on the defendant's cross-examination, the Court stated that "[i]t is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop." *Alford*, 282 U.S. at 692.

Searcy argues that the state courts' refusal to allow him to cross-examine Brooks and Johnson regarding the informant issue without first providing a foundation for his theory of bias in advance of that cross-examination violates the rule of *Alford*. But the trial court did not require that Searcy prove his defense theory before he would let Searcy cross-examine them regarding a potential motivation for murdering Bowman. The trial court simply conditioned Searcy's inquiry into the informant issue on his ability to lay a sufficient factual predicate for that line of questioning, to avoid potential "insinuations and innuendos, and not fair, logical inferences." (Trial Tr. at X-88.) That factual predicate was not required to come solely from the testimony of Brooks and Johnson; the trial court told defense counsel that if the two witnesses would not admit to such knowledge, "I think you have to [prove] it in some other competent way." (Trial Tr. at X-88.)

The trial court's decision to require a sufficient factual basis for the line of questioning as a precondition to cross-examination does not run afoul of *Alford*. On the contrary, the *Alford* Court noted that a defendant need be given "*reasonable* latitude" to conduct a "*reasonable* cross-examination." *Alford*, 282 U.S. at 692 (emphasis added). In his brief to this court, Searcy himself acknowledges that *Alford* applies to "otherwise appropriate" cross-examination. It is well established that purely conjectural or speculative cross-examination is neither reasonable nor appropriate. *See, e.g., Bui v. DiPaolo*, 170 F.3d 232, 243-46 (1st Cir. 1999) ("One well-established basis for circumscribing cross-examination is a party's inability to lay a proper evidentiary foundation for the questions he wishes to pose." (citations omitted)).

In this case, the Illinois state courts applied the correct rule—the state appeals court identified the importance of a defendant's right under the Confrontation Clause to cross-examine the witnesses against him, and it cited the correct authority governing the exercise of that right (as acknowledged by the district court)—yet determined that Searcy had not provided enough of a factual basis to fairly allow him to ask highly prejudicial questions. In other words, the trial court's requirement that cross-examination of Johnson and Brooks be preceded by a showing of a sufficient factual basis for the questions ensured that Searcy's line of inquiry was "otherwise appropriate." We note that the Supreme Court has recognized that "[t]he extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court." *Alford*, 282 U.S. at 694. Given this, we cannot say that the trial court's decision was contrary to *Alford*.

## B. *Searcy's "Unreasonable Application" Claim*

Searcy next argues that his conviction involved an unreasonable application of the federal law laid down in a trio of Supreme Court cases: *Van Arsdall*, *Davis*, and *Olden*. A state court decision involves an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has emphasized that "[t]he 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade*, 123 S. Ct. 1166, 1174 (2003) (citations omitted); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). We have taken this to mean that substantial deference is due state court determinations: "the statute commands deference to the state court's judgment by using the word 'unreasonable,' which is stronger than 'erroneous.'" *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997); *see also Lockyer*, 123 S. Ct. at 1175 (cautioning against conflating error with unreasonableness). Under such a deferential regime, a reasonable state court judgment is one "at least minimally consistent with the facts and circumstances of the case . . . even if it is not well reasoned or fully reasoned, or even if it is one of several equally plausible outcomes." *Schaff v. Snyder*, 190 F.3d 513, 523 (7th Cir. 1999) (quotations omitted).

From the trio of cases he cites, Searcy distills this governing legal principle: "Courts may not completely foreclose cross-examination regarding witness bias." In *Davis*, the Supreme Court emphasized that "[t]he partiality of a

witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. . . . [T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. " 415 U.S. at 316 (quotation and citation omitted). The importance of permitting a defendant broad scope in cross-examining the witnesses against him was reaffirmed by the Court in *Van Arsdall*, 475 U.S. at 678-79, and *Olden*, 488 U.S. at 231.

But it is also well established that a defendant does not enjoy an unlimited right to pursue *any* subject on cross-examination, as the Supreme Court has made clear:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Arsdall*, 475 U.S. at 679. Lower courts have applied this language to justify limitations on cross-examination into subjects for which there is no proper foundation, *see Reddick v. Haws*, 120 F.3d 714, 717 (7th Cir. 1997) (finding that limitation on cross-examination was appropriate when the defendant "could neither lay a rudimentary foundation for the circumstances [into which he wished to inquire], nor establish when the underlying conduct took place, despite the considerable leeway the trial court was willing to give him on this"); *United States v. Lin*, 101 F.3d 760, 767-68 (D.C. Cir. 1996) ("Highly

prejudicial questioning of the sort proposed here, however, requires a reasonable grounding in fact."); *Bui*, 170 F.3d at 243-46, or into matters that are unduly speculative, *see United States v. Lo*, 231 F.3d 471, 482-83 (9th Cir. 2000) (affirming limitation on cross-examination into fraud allegations because of "the highly speculative nature" of those allegations).

In Searcy's case, the district court found that the Illinois courts had unreasonably applied the *Van Arsdall-Davis-Olden* principle by "precluding the defense from cross-examining the State's key witnesses about their biases and motives." *Searcy*, 2002 U.S. Dist. LEXIS 19899, at *29. But that is too broad a characterization of what the state courts did. They did not foreclose *any* inquiry into the bias or motivation of key prosecution witnesses; such a complete limitation would clearly violate the rule of *Davis*, *Van Arsdall*, and *Olden*. Rather, the state courts required that before Searcy could question Johnson and Brooks about Bowman negotiating to act as a police informant, he provide, by competent evidence, a sufficient factual basis for those questions—what the trial court judge called the "linchpin of this issue." The question in this habeas case, therefore, comes down to whether the trial court, in requiring a (rather substantial) showing of factual support for Searcy's informant questions, went beyond imposing a "reasonable" limit (based on foundation concerns) on Searcy's ability to confront the witnesses against him.

At trial, Searcy offered several items of evidence that he said provided a factual basis for his informant questions, the most important of which was the testimony of Officer Washington. The officer was prepared to testify that at the time of Bowman's arrest, there was another individual present (Clinton Boyd) who was close enough to have heard Bowman protest that the police had "got the wrong guy" and that they should go after "Country"

(Brooks's nickname). He would testify that after the arrest, he began to negotiate a deal whereby Bowman would work as a police informant in exchange for lenient treatment in connection with his drug arrest, but that Bowman was killed before the deal could be finalized. Officer Washington was apparently unable to testify, however, that Clinton Boyd had told either Johnson or Brooks of Bowman's accusatory statement at the time of his arrest, that Clinton Boyd was even aware of the negotiations over Bowman's informant status, or that anyone else had learned of the negotiations and informed either Johnson or Brooks.

In addition to Officer Washington's testimony, Searcy offered the testimony of Tonita Mills, who stated at trial that she had previously bought drugs from both Johnson and Brooks, and that she had witnessed Brooks arguing with Bowman immediately prior to his murder. Searcy contends that her testimony adds to his factual predicate by demonstrating that Brooks and Johnson had a reason to fear Bowman's informing on them (by showing that they actually were drug dealers) and that Brooks was angry at Bowman for some reason, causing them to argue. Searcy also noted that during the *voir dire* of Johnson outside the presence of the jury, Johnson admitted that he knew both Clinton Boyd and Bowman, and that he had spoken with Bowman between his arrest and murder. Searcy suggests this evidence, taken together, provides a sufficient basis from which the jury could reasonably infer that Johnson had in fact learned of Bowman's informant activities.

Both the Illinois trial court and the Illinois appellate court found that Searcy's evidentiary proffer was insufficient to avoid problems of innuendo and insinuation. The district court disagreed, finding that the state courts should have allowed cross-examination on the issue of

Brooks's and Johnson's motivation for murdering Bowman. The district court concluded that "[g]iven the theory of bias and motive at stake, the centrality of Brooks's and Johnson's testimony to the prosecution, and defendant's good faith predicate," the limitation on Searcy's cross-examination of Brooks and Johnson violated his Confrontation Clause rights. *Searcy*, 2002 U.S. Dist. LEXIS 19899, at *26. As demonstrated by the district court's opinion, that determination required the balancing of several factors. *See id.* at *23 ("Confrontation Clause violations do not lend themselves to simple straightforward analysis, but rather involve a balancing of many factors."). Presumably, the state courts weighed the same factors as the district court—the theory of the defense, the importance of the testimony of Johnson and Brooks to the prosecution, and the strength of the proffered factual predicate for the line of questioning—but came to a different conclusion.

As the Supreme Court has emphasized, for a federal habeas court to reject the state courts' application of federal law, the state courts' conclusions must be "more than incorrect or erroneous." While we would have preferred that the trial court had accepted a less substantial factual showing before allowing cross-examination, or that Searcy have been allowed to cross-examine the witnesses based on the proof he had offered, our view of the "correct" conclusion is not dispositive. Our review is limited to the question of whether the state courts' resolution of the issue was "objectively unreasonable." *Lockyer*, 123 S. Ct. at 1174. A federal court's deference to the state court's resolution of the issues involved is even more important when such resolution requires the weighing of factors against one another: "when the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored." *Holman v. Gilmore*, 126 F.3d 876, 881-82 (7th Cir. 1997) (quotation omitted)). Indeed, the trial tran-

script discloses an informed and highly professional discussion among the judge and opposing lawyers on this issue.

In this case, we cannot say that the Illinois courts' determination that Searcy had failed to establish a sufficient factual basis for his desired line of questioning was "objectively unreasonable." On the contrary, the Illinois courts' decision was "at least minimally consistent with the facts and circumstances of the case . . . even if it is not well reasoned or fully reasoned;" that decision was, at the least, "one of several equally plausible outcomes." *Schaff*, 190 F.3d at 522.

Searcy's offer of proof in support of his cross-examination effort was far from a "slam dunk." The testimony of Officer Washington and Tonita Mills, as well as the admission by Johnson that he both knew and had spoken with Clinton Boyd, simply established that it was *possible* for Boyd to have heard Bowman's statement regarding Brooks at the time of his arrest, and that it was *possible* for Boyd to have mentioned this to Johnson, who then *possibly* told Brooks. The evidence proffered by Searcy did not suggest how Boyd, Johnson, or Brooks had become aware (if indeed they had) that Bowman had moved beyond making a "you got the wrong guy" statement at the time of his arrest to begin negotiations to serve as a police informant. Finding the offer of proof insufficient to support the line of questioning Searcy desired was a "plausible" (even if, in our opinion, incorrect) conclusion by the state trial and appellate courts.

While it is true that when the testimony of a witness is central to the prosecution's case, a defendant should be given the "maximum opportunity" to cross-examine that witness, *Burr v. Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980), that does not mean that a defendant will be given *every* opportunity, no matter how speculative, confusing, or irrelevant the line of questioning may be. While a

close question in this case, we cannot say that it was unreasonable for the Illinois courts to have required Searcy to demonstrate a factual basis for the informant line of questioning (even if we disagree with the level of proof the Illinois courts required). Because that decision was not objectively unreasonable, it is entitled, under AEDPA, to deference from a federal habeas court.

## CONCLUSION

The Illinois Court of Appeals' decision affirming Searcy's conviction was neither "contrary to" nor did it involve "an unreasonable application of" clearly established federal law. Therefore, the decision of the district court granting Searcy's petition for a writ of habeas corpus is REVERSED and Searcy's petition is DENIED.

CUDAHY, *Circuit Judge*, dissenting. As the district court and the majority have both recognized, this case boils down to balancing Searcy's constitutional right to confront his accusers against a requirement that he make a more or less conclusive showing (as an evidentiary foundation) that Brooks and Johnson were aware of Bowman's informant activities. The district court held that the Illinois courts had struck an unreasonable balance, while the majority believes that those courts reached "one of several equally plausible outcomes," even if not the "preferred" one. Maj. op. at 17, 18. I agree with the district court that the state balancing was so lopsided as to amount to an unreasonable application of Supreme Court precedent. The difference between the state view and an appropriate

federal view is more than the minor discrepancy that the majority would countenance in an exercise of deference.

Since the majority opinion does an admirable job of laying out the relevant facts, I shall stress only a few key points. First, Brooks and Johnson were not merely *central* to the prosecution's case—they *were* the case. The prosecution's only evidence tying Searcy to Bowman's murder was the testimony of Brooks and Johnson; there was no physical evidence at all (indeed, the medical evidence strongly suggested that at least part of Brooks' testimony was false). Brooks and Johnson came forward with their eyewitness accounts almost a full year after the murder had taken place, although they had been interviewed by the police on the day of the murder. Second, Searcy's defense at trial was that Brooks and Johnson were the guilty parties. To support this theory, Searcy needed to demonstrate to the jury a potential motive for Brooks and Johnson to murder Bowman. Searcy planned to show such a motive by cross-examining Brooks and Johnson on their rumored membership in a gang that sold narcotics in competition with Bowman and their probable awareness of the fact that Bowman was cooperating with police as an informant on Brooks' drug activities. Both lines of cross-examination were, as recounted in the majority opinion, denied.

Third, Searcy offered outside of the jury's presence substantial evidence connecting Brooks and Johnson to knowledge of Bowman's informant activities. Chicago police officer Donald Washington swore in an affidavit that he and another officer had arrested Bowman three months before his murder. At that time, in the presence of Clinton Boyd, who was a neighbor of Johnson, Bowman protested that Washington had "the wrong guy," and that he should instead arrest Brooks. Washington further swore that Bowman was actually in negotiations to act as an informant against Brooks before Bowman was

murdered. Of course, Brooks denied knowledge of these facts, but when questioned outside the presence of the jury about them, he became quite agitated, prompting the trial judge to instruct Brooks to "remain calm" and "restrain [himself]." Johnson acknowledged speaking to Boyd in the time between Bowman's arrest and Bowman's death, though only casually and not about Bowman.

The decisions of the Illinois courts here cannot be reconciled with the abundant precedent that protects a defendant's constitutional right to probe bias and motive of prosecution witnesses in cross-examination before the jury. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony.") (internal quotation marks omitted); *Redmond v. Kingston*, 240 F.3d 590, 593 (7th Cir. 2001) ("'[W]hile generally applicable evidentiary rules limit inquiry into specific instances of conduct through the use of extrinsic evidence and through cross-examination with respect to general credibility attacks, . . . no such limit applies to credibility attacks based upon motive or bias.'" (quoting *Quinn v. Hayes*, 234 F.3d 837, 845 (4th Cir. 2000)). Trial courts must permit defendants "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 318. "Limitations on cross examination rise to the level of a Sixth Amendment violation when they prevent the exposure of a witness's bias and motivation to lie." *United States v. Smith*, 308 F.3d 726, 738 (7th Cir. 2002) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986)). The importance of the right of cross-examination is heightened when the testimony of the witness in question is the only evidence directly linking the defendant to the crime. *Olden v. Kentucky*, 488 U.S. 227, 233 (1988); *Davis*, 415 U.S. at 317-20. Where a witness's tes-

timony is "virtually the only evidence of [the defendant's] guilt," the witness's credibility becomes the "central issue in the case." *Redmond*, 240 F.3d at 592. The Confrontation Clause requires that a defendant be allowed to question such key witnesses so that the jury can "make an informed judgment as to the weight to place on . . . testimony which provide[s] a crucial link in the proof" against the defendant. *Davis*, 415 U.S. at 317 (internal quotation marks omitted).

Even though the denial here of effective cross-examination seems erroneous in itself, the prosecutor's closing arguments made that denial even more prejudicial: "Where is [Brooks' and Johnson's] motive? We have all these little shadowy insinuations, all these speculations about drugs . . . . How does that tie into [Brooks and Johnson]? . . . There is no evidence folks." The prosecution referred to Brooks and Johnson as "heroes," "excellent witnesses" and "two of the most credible people that will ever come into a courtroom." Ignoring Brooks' obvious agitation outside the presence of the jury, the prosecution also referred specifically to the heightened credibility conferred by his demeanor in court. These jury arguments highlight the overwhelming importance to Searcy of his Confrontation Clause right to cross-examine Brooks and Johnson.

Searcy showed that Bowman was about to act as an informant against Brooks. Searcy also showed that Johnson's neighbor had likely overheard Bowman tell the police that Brooks should be arrested for drug dealing. Johnson even admitted to speaking with his neighbor in the relevant time period. The only piece of information not fully verified was whether, in fact, the critical information was transmitted from Johnson's neighbor to Johnson and Brooks. In essence, the trial judge refused Searcy his constitutional right to cross-examination simply because Brooks and Johnson refused to inculpate themselves on the stand. This, I believe, was a serious error.

Even if cross-examination of Brooks and Johnson on these matters had resulted in denials, cross-examination would have permitted the jury to observe Brooks' agitated demeanor when confronted. *See Henry v. Speckard*, 22 F.3d 1209, 1215 (2d Cir. 1994) (explaining that "the witness may well answer bias-probing questions in the negative; but the matter of whether her answers should be believed or disbelieved is within the sole province of the jury"). Balanced against the crucial significance of Brooks' and Johnson's testimony, the purported "missing link" in Searcy's motive evidence hardly presented a sufficient degree of speculation to justify denial of his Sixth Amendment rights.

I therefore respectfully dissent.

A true Copy:

      Teste:

                                _____

                                *Clerk of the United States Court of Appeals for the Seventh Circuit*